# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DESMOND MAPP

CIVIL ACTION

VERSUS

NO. 15-602-JWD-RLB

UMG RECORDINGS, INC.

## RULING AND ORDER

Before the Court is a Motion for Judgment on the Pleadings (Doc. 16) filed by Defendants UMG Recordings, Inc. ("Defendants") pursuant to FED. R. CIV. PRO. 12(c), and Plaintiff's Motion to Strike and for Leave of Court to File a Rebuttal Memorandum.[1] (Doc. 42.) Plaintiff Desmond Mapp ("Plaintiff") has filed a memorandum in opposition (Doc. 25) and a supplemental memorandum in opposition (Doc. 36); Defendant has replied to both documents (Docs. 28 and 39); and Plaintiff has filed a reply (Docs. 40, 42) to Defendant's supplemental brief, and attached a proposed second amended complaint.[2] (Docs. 40-1, 42-2.) Jurisdiction is proper pursuant to 17 U.S.C. § 101, et seq. and 28 U.S.C. §§ 1331 and 1338(a). For the reasons stated below, Defendant's

---

[1] Oral argument on Defendant's motion for judgment on the pleadings was held on July 13, 2016, at which time the Court requested additional briefing. (Doc. 35.) Specifically, the Court authorized Plaintiff to file a supplemental brief on or before July 27, 2016, and allowed Defendant to respond two weeks thereafter. Plaintiff filed such brief (Doc. 36) on July 26, 2016, and attached a proposed second amended complaint (Doc. 36-1). Defendant responded on August 9, 2016 (Doc. 39). Thereafter, on August 23, 2016, without seeking leave of court, Plaintiff filed a reply (Doc. 40) to Defendant's supplemental brief, to which it attached an additional (and materially different) proposed amended complaint. (Doc. 40-1.) Defendant then filed a motion to strike Plaintiff's reply, arguing it lacked authority to file it, and did not seek leave of court to do so. (Doc. 41.) Plaintiff, in turn, filed its own motion to strike and for leave of court to refile its rebuttal memorandum (Doc. 42) and attached his proposed amended complaint. (Doc. 42-2.) Defendant has filed an opposition to Plaintiff's motion to strike and for leave of court. (Doc. 43.)

[2] Although Plaintiff captions Doc. 40-1 as its Second Amended Complaint, it is actually Plaintiff's *third* proposed amended complaint; Plaintiff submitted a proposed Second Amended Complaint (Doc. 36-1) as an attachment to its supplemental memorandum in opposition to Defendant's motion for judgment on the pleadings (Doc. 36). Plaintiff for the first time in Doc. 40-1 proposes to name Cash Money as a defendant. (*See* Doc. 40-1 at 2.) However, as discussed below, the naming of this additional party will not give merit to Plaintiff's claims, and ultimately this amendment is futile.

motion for judgment on the pleadings is **GRANTED** and Plaintiff's motion to strike and for leave to file a rebuttal memorandum is **DENIED.**

## I. Relevant Factual Background

Plaintiff is a record producer, singer, and songwriter residing in Baton Rouge, LA. (Doc. 2 at 2.) Defendant is a Delaware corporation engaged in the business of manufacturing and distributing records. *Id.* Tyga Music, LLC ("Tyga Music") is a special purpose entity formed to furnish the recording services of its owner, Michael Stevenson, p/k/a Tyga ("Stevenson") to Young Money Entertainment, LLC ("Young Money"). (Doc 2 at 2.) Young Money, through Defendant, provides Tyga Music with record distribution services throughout the United States. (Doc 2 at 2.)

Cash Money Records, Inc. ("Cash Money"), the principal of Young Money, has an ownership interest in all of Young Money's property.[3] (Doc. 16-1 at 10.) Cash Money previously entered into a Licensing Agreement with Universal Records, granting Universal Records the exclusive right to "manufacture, distribute, sell, market, advertise, promote, and otherwise exploit Cash Money Product." *Id.* Defendant is the parent company and successor in interest to Universal Records.

On or about September 1, 2012, Plaintiff entered into a Producer Agreement ("the Agreement") with Tyga Music and Stevenson, through which Plaintiff agreed to furnish the music and Stevenson agreed to supply the lyrics to the song *Molly*. (Docs. 2 at 3, 16-2 at 1, 25 at 5.) Pursuant to the Agreement, upon completion of the song, Plaintiff delivered the finished product to Tyga Music. (Docs. 2 at 3, 16-2 at 1.) The Agreement indicated Plaintiff was to be

---

[3] This Agreement provides for a joint venture between companies funded by Cash Money, including Young Money. The agreement provides that " after the deduction of the Distribution Fee and costs set forth in paragraphs 5 and 6 […] the profits of the Company and the ownership of all Company property (e.g. company recordings, intellectual property, goodwill, etc. shall be divided 51/49 between Cash Money and you (Young Money))." (Doc. 16-5 at 1.)

compensated an advance of $10,000 plus royalties based on record sales.[4] Plaintiff delivered the

completed rendition of *Molly* to Stevenson per the Agreement, who in turn transferred his

ownership interest in *Molly* to Young Money pursuant to a preexisting Recording Agreement.[5]

(Doc. 16-1 at 10.) Young Money subsequently delivered *Molly* to Defendant for exploitation of

the song. (Doc. 2 at 3.)

Defendant, relying on the aforementioned agreements, began to exploit *Molly* as a single

on March 29, 2013, and then as part of Stevenson's album *Hotel California* on April 9, 2013.

(Doc. 2 at 3.) Plaintiff alleges Tyga Music failed to pay him the advances and the producer

royalties,[6] as required by the Agreement, and that it failed to respond to his amicable demand for

payment. (Doc 2 at 3.)

On June 16, 2014, Plaintiff sued Tyga Music and Young Money in the 29th Judicial

District Court ("29th JDC"), seeking judicial dissolution of the Agreement. (Doc. 2 at 4; Doc 16-

1 at 4; *see also Mapp v. Young Money Entm't, L.L.C.*, 78-463 (29th JDC 05/20/2015).) When

Tyga Music and Young Money failed to answer or appear, the 29th JDC entered a default

judgment in Plaintiff's favor, thereby dissolving the Agreement between Plaintiff and Tyga

Music. *Id.* The 29th JDC entered its judgment on April 20, 2015. (Doc 16-1 at 4; *see also Mapp

v. Young Money Entm't, L.L.C.*, 78-463 (29th JDC 05/20/2015).) Plaintiff claims that his attorney

sent Defendant notice by certified mail that the Agreement between Plaintiff and Tyga Music

---

[4] According to Plaintiff, one half of the advance ($5,000) was due immediately upon commencement of the recording of *Molly*, or upon Plaintiff's execution of the Agreement with Tyga music; the second half of the advance was due upon delivery of *Molly* or upon full execution of the Agreement, whichever occurred later. (Doc. 2 at 3.)
[5] Paragraph 1.01 of the Recording Agreement provides: "You (Michael Stevenson p/k/a "Tyga") hereby represent, warrant, and agree that during the term of this agreement, you will render your exclusive recordings services to YME (Young Money Entertainment) in the territory as provided herein." Paragraph 1.02 provides "You are authorized, empowered, and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment here if by any party infringes upon the rights of any person." (Doc. 16-3 at 1.)
[6] Plaintiff alleges Defendant has sold more than 700,000 copies of *Molly* worldwide, which entitles him to 3-3.5% of the net royalties, depending on the amount of albums sold within the United States (Doc. 2 at 4). Defendant denies this allegation. (Doc. 9 at 3.)

concerning *Molly* had been judicially dissolved, that Tyga Music's right to exploit *Molly* had been revoked, and that the marketing, manufacturing, and distribution of *Molly* should cease immediately.[7] (Doc 2 at 4-5.)

### a. Plaintiff's Claim of Infringement of Copyright

On August 17, 2015, Plaintiff filed a copyright registration for *Molly* and received a receipt. (Docs. 2 at 5, 2-3 at 1-3.) He paid the fee and obtained a copyright registration number, 1-2647940521. *Id.* In support of his claim of copyright infringement, Plaintiff alleges he is now the sole copyright owner of the sound recording of *Molly*, and thus under the Copyright Act, he retains the exclusive right to reproduce, distribute, and digitally stream the song. (Doc 2 at 5.) He further alleges Defendant continues to manufacture, distribute, and sell physical and digital versions of *Molly* to the public without his permission or consent. (Doc. 2 at 5-6.) He argues Defendant's actions constitute infringement of his copyright and his exclusive rights thereunder. (Doc 2 at 6.) Plaintiff further asserts Defendant's actions "have been willful and intentional in disregard of, and with indifference to, the rights of Plaintiff especially since they continue despite actual notice of the judicial dissolution of the September 1, 2012 Agreement." *Id.* He claims Defendant's actions entitle him to damages pursuant to 17 U.S.C. § 504(c) and attorney's fees and costs pursuant to 17 U.S.C. § 505. *Id.*

On the other hand, Defendant admits it continues to manufacture, distribute, and sell the song *Molly*, but claims it holds to a valid license to do so. (Doc. 9 at 4, 7.) It otherwise steadfastly denies the factual allegations Plaintiff set forth in his complaint concerning his claim of copyright infringement. (Doc. 9 at 4.) Moreover, it claims that if it has infringed on any copyright interest held by Plaintiff, it did so innocently. (Doc. 9 at 7.)

---

[7] Defendant claims it has been unable to confirm receipt of this letter. (Doc. 9 at 3.)

### b. Plaintiff's Claim of Vicarious or Contributory Infringement

Plaintiff alleges Defendant, as the beneficiary of the above-mentioned agreements between Tyga Music, Young Money, and Defendant, has claimed the exclusive right to manufacture, reproduce, sell, distribute, and stream *Molly*. He further claims that without Defendant's assistance, Stevenson, Tyga Music, and Young Money would be unable to exploit *Molly*. Plaintiff argues the following acts by Defendant constitute vicarious or contributory infringement of his copyright and his rights thereunder: facilitating the sale of *Molly* in physical and digital formats for Stevenson, Tyga Music, Young Money, and for others "claiming rights derivative of the foregoing persons and entities"; facilitating the "streaming" of *Molly* through online music service providers; and facilitating the licensing of Molly to third parties. (Doc. 2 at 7.) Further, he claims Defendant knew or should have known Stevenson, Tyga Music, and Young Money lacked the right to sell *Molly*, and that Defendant "materially facilitated their unlawful conduct and declined to exercise its right to stop or limit others from infringing [on] Plaintiff's copyright." *Id.* He claims he is entitled to damages pursuant to 17 U.S.C. § 504(b) as a direct and proximate result of Defendant's vicarious infringement of his copyright. Defendant admits it "claims the right to manufacture, reproduce, sell, distribute, and/or stream" *Molly*, but otherwise denies the allegations Plaintiff has made against it in respect to this claim.

### c. Plaintiff's Claim under the Louisiana Unfair Trade Practices Act ("LUTPA")

Plaintiff also argues Defendant's conduct amounted to "unlawful, unfair, and/or fraudulent business practices in violation of Louisiana law." (Doc. 2 at 8.) Plaintiff alleges that as a result of Defendant's infringement, he has sustained and will continue to sustain substantial injury, loss and damage to his ownership rights. *Id.* He further alleges Defendant's actions "have proximately caused and will continue to cause [him] loss of customers, dilution of [his] goodwill,

confusion of existing and potential customers, injury to [his] reputation, and diminution of the value of [his] products." *Id.* He argues the harm caused by Defendant's actions is "imminent and irreparable" and, noting he has no adequate remedy at law, requests an injunction restraining Defendant from engaging in further infringement of his copyright. Defendant denies all allegations made by Plaintiff with respect to this claim. Moreover, Defendant alleges Plaintiff's claims under state law are preempted by the Copyright Act. (Doc. 9 at 7.)

### d. Plaintiff's Request for Injunction and Prayer for Relief

Plaintiff alleges he continues to suffer "great and irreparable injury that cannot fully be compensated or measured in money" as a result of Defendant's actions. Accordingly, he claims entitlement to injunctive relief "prohibiting Defendant from further infringing Plaintiff's copyright and ordering Defendant to destroy all copies of sound recordings made in violation of Plaintiff's exclusive rights" pursuant to 17 U.S.C. §§ 502 and 503. He further requests damages for each direct or indirect infringement of his copyright of *Molly* pursuant to 17 U.S.C. § 504, and for damages for Defendant's violation of the LUTPA and for Defendant's unfair competition. He also requests that Defendant pay his costs and attorney's fees, and for such other relief to which he may be entitled. Defendant denies Plaintiff is entitled to relief, and argues he is not entitled to attorney's fees. (Doc. 9 at 6, 7.)

### e. Defendant's Affirmative Defenses and Motion for Judgment on the Pleadings

Defendant raises several affirmative defenses, including that the complaint fails to state a claim upon which relief can be granted. *Id.* It further alleges Plaintiff failed to join an indispensable party and that the damages sought are barred in whole or in part by relevant statutes of limitations and/or prescriptive periods. *Id.* Further, it alleges Plaintiff's claims and the damages he seeks in connection therewith are barred in whole or in part because Defendant's

actions, if proven, were in good faith, justified, and lacked any wrongful intent. *Id.* Moreover, it

claims it holds a valid license to reproduce and distribute *Molly*, and that this license was not

disturbed by the 29th JDC's dissolution of the Agreement between Plaintiff and Tyga Music.

(Doc. 9 at 7.) Defendant argues Plaintiff's claims are barred because its alleged conduct, if

established, benefitted, not damaged, Plaintiff. Defendant also argues Plaintiff's damages, if

proven, "are directly or indirectly the result of actions of third parties over which [Defendant]

has no authority or control." *Id.*

In its Motion for Judgment on the Pleadings, Defendant asserts that Plaintiff cannot

succeed in his claims of copyright infringement because he has failed to obtain copyright

registration of *Molly*, and because Defendant obtained both an express and an implied license

authorizing distribution of Molly. (*See generally* Doc. 16-1 at 7-14.) It also claims Plaintiff's

LUTPA claim is preempted by the Federal Copyright Act, and in any event, his claim under

LUTPA has prescribed. *Id.* at 15-17. Defendant further argues that if this Court dismisses

Plaintiff's claims arising under the Copyright Act, it should likewise dismiss his state law claims

and decline to exercise its supplemental jurisdiction over same. *See id.* at 14-15. For the

foregoing reasons, Defendant alleges Plaintiff cannot prevail on his claim for injunctive relief

and asks this Court to grant its Motion for Judgment on the Pleadings.

### f. Plaintiff's newly-added claims

On August 23, 2016, Plaintiff filed a rebuttal memorandum (Doc. 40) addressing

arguments Defendant raised in its supplemental brief in support of its motion for judgment on the

pleadings (Doc 39). Attached to Plaintiff's memorandum is a proposed Second Amended

Complaint (Doc. 40-1). For the first time, Plaintiff seeks to name Cash Money as a defendant in

this case. He also seeks to distinguish between the musical composition of *Molly*, referring to the

music as "Molly 1" and the compilation of the music and lyrics to Molly, which he designates as "Molly 2" and argues Molly 2 is a derivative work of Molly 1. (*Id.* at 3-4.) He further argues the judicial dissolution of the Agreement between Plaintiff and Tyga Music rendered Molly 2 "an unauthorized derivative work because it incorporates Molly 1 without [Plaintiff's] consent or authorization." (*Id.* at 6.)

Defendant moved to strike Plaintiff's rebuttal memorandum and attached proposed amended complaint, arguing Plaintiff lacked authority to file this pleading and did not seek leave of court to do so. (Doc. 41-1 at 2.) Reaching the merits of Plaintiff's amended complaint, Defendant asserts the proposed amendments do not alter its entitlement to judgment on the pleadings, and while Plaintiff may have a state law claim against Cash Money, the instant case must nonetheless be dismissed. (*Id.* at 4.).

**II. Standard of Review**

"The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir. 2004). Accordingly, to defeat a Rule 12(c) motion for judgment on the pleadings, the complaint must (a) state a claim upon which relief can be granted, *Neitzke v. Williams,* 490 U.S. 319, 326 (1989), and (b) provide the Court with sufficient factual content from which "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). When evaluating a Rule 12(c) motion, the Court accepts all well-pleaded facts as true and views them in a light most favorable to the plaintiff. *Bustos v. Martini Club Inc.,* 599 F.3d 458, 461 (5th Cir. 2010).

**III. Discussion**

### a. Timeliness of Defendant's 12(c) motion

As an initial matter, Plaintiff argues Defendant's Motion for Judgment on the Pleadings was untimely filed and invites the Court to deny the motion on timeliness grounds. (Doc. 23 at 12.) Plaintiff cites no jurisprudence or statutory authority in support of his position, but rather argues that because the instant motion was filed three months after the close of pleadings, it should be considered untimely. *Id.* Defendant, on the other hand, argues its motion is timely filed because discovery has not yet begun in this case, the motion did not delay trial, and it did not cause Plaintiff to suffer prejudice as a result of its filing. (Doc. 28 at 5.)

A motion for judgment on the pleadings may be filed "[a]fter the pleadings are closed—but early enough not to delay trial[.]" FED. R. CIV. PRO. 12(c); *cf. Easter v. Caldwell*, 14-0967, 2015 WL 65141862, at *3 (W.D. La. Oct. 27, 2015). This rule functions as a safeguard to protect the non-movant from suffering prejudice, and to ensure the motion does not delay the trial. *Caldwell*, 2015 WL 65141862, at *3. Other courts have construed the timeliness of Rule 12(c) motions liberally; for example, when faced with the issue of the timeliness of a 12(c) motion filed two days before trial, the Sixth Circuit found the motion timely because the non-movant failed to argue prejudice as a result of the filing of the motion. *See Gen. Elec. Co. v. Sargent & Lundy*, 916 F. 2d 1119, 1131 (6th Cir. 1990).

In this case, discovery has not yet begun, and trial is slated to begin in May 2017. (*See* Doc. 15.) Plaintiff has made no showing that Defendant's motion, filed more than fifteen months before trial, and prior to the start of discovery, will delay trial or cause Plaintiff any prejudice. Accordingly, the Court finds Defendant's motion timely filed and Plaintiff's arguments to the contrary are without merit.

**b. Plaintiff's copyright interest in *Molly***

Defendant alleges Plaintiff cannot maintain this action for copyright infringement because he has not presented proof of a valid copyright registration. (Doc. 16-1 at 7.) Plaintiff argues Defendant's contention is erroneous, and insists he has obtained a valid copyright registration, as demonstrated by evidence he provided that he filed a copyright registration application with the U.S. Copyright Office, obtained an assigned case number, paid the requisite filing fees, and made a complete material deposit prior to initiating this lawsuit. (Doc. 25 at 4.) Thus, he maintains he has standing to enforce his rights under copyright, and Defendant's contrary arguments are misguided.

In the exercise of its constitutional authority, U.S. Const. art. I, § 8, cl. 8, amending several prior laws, Congress passed the Copyright Act of 1976,[8] an Act for the general revision of the Copyright Law, title 17 of the United States Code, and for other purposes, Pub L. No. 94-553, 90 Stat. 2541 (Oct. 19, 1976). Under the Act, "[c]opyright in a work protected under this title vests initially in the author or authors of the work," and "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title." 17 U.S.C. § 201(a)–(b); *Goodman v. Lee*, 815 F.2d 1030, 1032 n.6 (5th Cir. 1987) (citing § 201(a)); *Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 328 (5th Cir. 1987) (citing § 201(b) and the definition of "work for hire" encoded in § 101(1)–(2)). A copyright arises—and the Act's protection attaches—once an "original work[] of authorship" has been "fixed in any tangible medium of expression, now known or later developed, for which . . . [it] can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a); *see*

---

[8] The specific provisions of the Act, set forth in 17 U.S.C. §§ 101–810 inclusive, are referred to in this ruling as "Section []" or "§ []" unless otherwise noted.

*also, e.g.*, *Rodrigue v. Rodrigue*, 218 F.3d 432, 435–36 (5th Cir. 2000) ("[T]he author's copyright arises at the moment of creation of the work[.]"); H.R. Rep. No. 94-1476, at 51 (1976) (describing "originality and fixation in tangible form" as the "two fundamental criteria of copyright protection" established in § 102(a)).

While § 102(a) specifies the two predicates for a copyright's emergence, § 411(a) adds a wrinkle. In pertinent part, this subsection provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title," and registration requires the submission of an application, fee, and two complete copies of the work to be copyrighted. 17 U.S.C. §§ 411(a), 408(a), (b)(2); *Real Estate Innovation, Inc. v. Houston Ass'n of Realtors, Inc.*, 422 F. App'x 344, 348 (5th Cir. 2011)). Further, this copyright registration is considered obtained on the day that the application, deposit, and fee have been received in the Copyright Office. 17 U.S.C. § 410(d). Therefore, the only prerequisite to filing suit is the proof of payment of the fee, deposit of the work, and receipt by the Copyright Office of registration application; it is not necessary to prove that the registration was certified. *Geoscan, Inc. of Texas v. Geotrace Techs., Inc.*, 226 f 3d 387, 392-393 (5th Cir. 2000); *Lakedreams v. Taylor*, 932 F. 2d 1103, 1108 (5th Cir. 1991).

In the present case, Plaintiff has pled and provided evidence showing that he has completed the copyright registration application, deposited the work with the Copyright Office, and has paid the required fee. (Doc. 2 at 5; Doc. 2-3.) For purposes of Rule 12(c), the Defendant has failed to provide any evidence conclusively demonstrating that the Plaintiff failed to register the requisite copyright. Defendant's assertion that Plaintiff must first obtain a copyright

certificate incorrectly interprets the jurisprudence explicating the elements of a meritorious claim for copyright infringement, and Defendant is not entitled to relief on these grounds.

### c.  Plaintiff and Stevenson are co-authors, and thus co-owners, of *Molly*

In support of its motion, Defendant asserts that Plaintiff and Stevenson are co-authors, and thus co-owners, of *Molly*. (Doc. 16-1 at 9-10.) It argues this fact is clearly evidenced by the Agreement, which even if subsequently judicially dissolved, nevertheless reflects Plaintiff's and Stevenson's intent at the time of signing to collaborate to create *Molly*, with Plaintiff providing the music and Stevenson providing the lyrics. *Id.* It further argues that the combination of music and lyrics rendered *Molly* a "unitary whole" consisting of "inseparable" and "interdependent" parts contributed by Plaintiff and Stevenson, thus making them co-authors and co-owners, a fact that remains unchanged by the subsequent judicial dissolution of the Agreement. *Id.* Stevenson had the authority to license Defendant to distribute work, and thus he and his licensees (including Defendant) cannot be liable for copyright infringement. *Id.* at 10-11.

Plaintiff, on the other hand, argues that because "[t]here is no written agreement authorizing the creation of a joint work utilizing [Plaintiff's] music or defining the scope of [Defendant's] use of [Plaintiff's] work under [Defendant's] claim of express or implied license[,]" Defendant cannot establish that Plaintiff and Stevenson are co-authors and thus co-owners of *Molly*. (Doc. 25 at 5.) In essence, Plaintiff asks this Court to ignore the fact that he and Stevenson entered into the Agreement and give no credence to their intent at the time the Agreement was formed because of its subsequent judicial dissolution. *See id.* He insists the words and the music to *Molly* "were separately created, both have meaning standing alone and are susceptible to copyright independently," and thus *Molly* should not be considered a joint work.

Because the Agreement was judicially dissolved, the owner of *Molly* must be determined. In this case, the parties properly represent that the ownership of this work will depend on the authorship. (Doc. 16-1 at 9, Doc. 25 at 5.) On this point, the law is well-settled. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101; *see also, e.g.*, *Quintanilla v. Texas Television Inc.*, 139 F.3d 494, 498 (5th Cir. 1998); *BTE v. Bonnecaze*, 43 F. Supp. 2d 619, 622 (E.D.La. 1999). The definition of a joint work also serves as a definition of a work of joint authorship. *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991) (*citing* 1 NIMMER ON COPYRIGHT § 6.01 (1991)). Under the Act, co-authors of a joint work are considered co-owners of a copyright in that work. 17 U.S.C. § 201(a); *see also, e.g.*, *Goodman v. Lee*, 78 F.3d 1007, 1011 (5th Cir. 1996).

The joint work is dependent on the creation of the work by the joint authors, as well as the nature of the work. *Childress*, 945 F.2d at 505. "[A] work is 'joint' if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as 'inseparable or interdependent parts of a unitary whole.'" *Id.* (*quoting* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976); S.Rep. No. 473, 94th Cong., 2d Sess. 103 (1975)). The linchpin of the statutory definition of a joint work "is the intention *at the time the writing is done* that the parts be absorbed or combined into an integrated unit." *BTE*, 43 F. Supp. 2d at 622 (quoting *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) (citing H.R. Rep. No. 1476, 94th Cong. 120, 121 (1976)) (internal quotations omitted) (emphasis added); *see also Childress*, 945 F.2d at 505 ("[t]he touchstone here is the intention, at the time the writing is done[.]"). Furthermore, "parts of a unitary whole" are "interdependent" when they can have some meaning standing alone, but

13

"achieve their primary significance because of their combined effect, as in the case of the words and music of a song." *Childress*, 945 F.2d at 505 (*citing House Report* at 120; *Senate Report* at 103). The court in *Childress v. Taylor* promulgated a two-prong test used by courts to determine whether a contributor to a copyrighted work is entitled to be regarded as a joint author, which asks whether the party claiming joint authorship has established that the parties: "(1) made independently copyrightable contributions to work; and (2) fully intended to be co-authors." *Thomson*, 147 F.3d at 199-200 (*citing Childress*, 945 F.2d 500); *see also, Aillet, Fenner, Jolly & McClelland, Inc. v. U.L. Coleman Co., Ltd.*, 2012 WL 4450997, at *2 (W.D. La. Sept. 25, 2012); *BTE*, 43 F. Supp. 2d at 622-625.

The parties here agree that Stevenson provided and the lyrics and Plaintiff provided the music to the song *Molly*. (Docs. 16-1 at 9; 25 at 5.) It is thus uncontested that their copyrightable contributions were made independently, and the first prong of *Childress* is easily satisfied. Under the second prong, it is critical that the contributors intended to be co-authors, not merely collaborators. This does not require a finding that the parties explicitly discussed the subject; rather, courts evaluate the factual indicia of ownership and authorship, such as how a collaborator regarded themselves in relation to the work. *BTE*, 43 F. Supp. 2d at 624 (citing *Childress* at 508-509). The *Childress* test is a fact-specific inquiry, and courts have looked at factors such as decision-making authority, billing, written agreements with third parties, and any additional evidence in determining whether the parties had the requisite intent to be co-authors. *Childress*, 945 F.2d at 508-09; *Thomson*, 147 F.3d at 202-05.

In the present case, the only indication of the intent of the parties at the time of creation of the work is the Producer Agreement.[9] (Doc. 16-2.) The Agreement described Plaintiff's

---

[9] As discussed above, the Agreement was later dissolved by the 29th JDC through a Default Judgment. (Doc. 1-1.) While the contract is no longer binding, it still evidences the intent of the parties at the time of creation.

relationship to Stevenson and his representatives. *Id.* With regard to decision-making authority, the Agreement gave Plaintiff creative control of production; however, Tyga Music (representing Stevenson) reserved the right to demand alterations to the music at its discretion, as well as the right to review rough mixes of the work for approval before final mixing. (Doc. 16-2 at 1.) Further, Tyga Music reserved the right to modify the work at its discretion. *Id.* Plaintiff was not allowed to distribute the work independently. *Id.* at 3. Both Stevenson and Plaintiff were to be credited with song authorship for purposes of billing and crediting. *Id.* at 5. Additionally, the Agreement expressly mentioned the existence of separate contracts between Tyga Music and various third parties, and mandated Plaintiff assent to the terms of distribution contained in said third party contracts. *Id.* at 1, 8-9. Additionally, the Agreement noted that there are particular industry standards that generally inform these type of agreements, and it purported to adhere to these standards. *Id.* at 1. Jurisprudence suggests these standards presume producers and editors are to be regarded as joint authors. *See generally, Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120 (C.D. Cal. 2001). Furthermore, the Agreement also discusses the importance of protecting Stevenson's intellectual property. (Doc. 16-2 at 2.) Thus, it is clear that Plaintiff and Stevenson formed the Agreement to facilitate a joint authorship between producer and artist, thereby creating a joint work which the parties co-own. (*Id.* at 1; Doc. 25 at 5.)

Moreover, while Plaintiff cites the *Childress* case for the proposition that because the works were created independently and then combined, they do not constitute a joint work, *Childress* states the opposite. As stated above, under *Childress*, "parts of a unitary whole" are "interdependent" when they can have some meaning standing alone but "achieve their primary significance because of their combined effect, as in the case of the words and music of a song." 945 F.2d at 505. The instant case presents an analogous situation, and the unambiguous

15

documents provided by Plaintiff, including his own copyright registration statement and the Agreement, support this conclusion.

Plaintiff also argues that Stevenson needs to present a valid written agreement between them to support a finding of co-authorship, though he fails to cite any jurisprudence substantiating this claim. (Doc. 25 at 5.) Plaintiff further postulates Stevenson cannot be considered a co-author because the Agreement was dissolved to the extent that it never existed. *Id.* Plaintiff's interpretation of federal statutes and jurisprudence is misguided, and his theory runs astray of basic principles under Louisiana's law of obligations. Plaintiff's claim that a written agreement is necessary to establish co-ownership lacks merit, as does his interpretation of the consequences of judicial dissolution of the Agreement. A default judgment, which results in the judicial dissolution of a contract, simply dissolves the contract; it does not rescind the contract to the extent that it is a complete nullity. La. Civ. Code arts. 2013, 2018, 2029, 2033. Thus, while this Court cannot enforce the Agreement as a consequence of its dissolution, it can nonetheless use it as evidence of the parties' intent at the time they entered into it.

Based on the foregoing, the evidence, even viewed in light most favorable to Plaintiff, indisputably shows that *Molly* was a joint work by Stevenson and Plaintiff. Therefore, they are co-authors and co-owners. Moreover, even if the Court were to accept Plaintiff's premise and treat the Agreement as if it never existed, this would not alter its conclusion, and a finding of joint ownership would be amply supported by jurisprudence. *See e.g.*, *Morrill*, 157 F. Supp. 2d at 1126 ("In the case of a sound recording, the law is clear: absent an employment relationship or express assignment of copyright, the copyright for the sound recording 'will be either exclusively in the performing artists, or (assuming an original contribution by the sound engineers, editors,

etc., as employees of the record producer), a joint ownership between the record producer and the performing artists.'" (quoting 1 NIMMER ON COPYRIGHT § 2.01[A][3] (2001)).

### d. Co-owners rights to license *Molly*

Defendant argues that because Plaintiff and Stevenson are co-owners of *Molly*, they each possessed the legal authority to grant a license that defeats a claim of copyright infringement. (Doc. 16-1 at 10.) According to Defendant, it follows that Stevenson, as a co-owner of *Molly*, had the authority to grant a valid license or transfer his ownership interest in the song, and the various preexisting agreements in place between it, Stevenson, Tyga Music, Young Money and Cash Money gave Defendant a valid license to exploit the song. *Id.* It further argues the judicial dissolution of the Agreement does not affect these other freestanding agreements, and therefore does not undermine Defendant's license to market and distribute *Molly*.[10] *Id.*

Plaintiff argues that, even assuming arguendo that Stevenson, as co-owner of *Molly*, validly licensed the song to Defendant, the rights Defendant is claiming under its purported license exceed the scope of what Stevenson could license without Plaintiff's consent. (Doc. 25 at 6-8.) Specifically, he alleges Stevenson cannot grant an exclusive license to third parties without his consent; that the licensee cannot exploit *Molly* internationally without consent of all co-owners; and Stevenson cannot unilaterally license a joint work in such a manner as to cause

---

[10] Specifically, Defendant alleges that the following agreements grant a valid license to it to distribute *Molly*: (1) Stevenson, as co-author and co-owner of *Molly*, transferred his ownership interest in the song to Young Money by operation of his Recording Agreement with Young Money; (2) Cash Money, as Young Money's principal, maintains a 51% ownership interest in all of Young Money's "property," including recordings. Therefore, Cash Money obtained an ownership interest in *Molly* upon Stevenson's transfer of his rights to the song; (3) UMG is the parent company and successor-in-interest to Universal Records. On May 1, 1998, Universal entered into the License agreement, through which Cash Money granted Universal the "right to manufacture, distribute, sell, market, advertise, promote, and otherwise exploit *Cash Money Product* or the *Record* concerned and the accompanying Artwork, including, without limitation, the right to exercise all rights as the exclusive copyright licensee of Cash Money Product." The License Agreement between Universal and Cash Money defined "Cash Money Product" as "Master Recordings or Masters... that are owned or controlled, in whole or in part, directly or indirectly by Cash Money." (Doc. 16-1 at 10-11, quoting Docs. 16-3 at 22; 16-5 at 1; 16-6 at 1; and 16-7 at 1.)

destruction of the work and render Plaintiff's rights valueless. *Id.* at 6 (citing *Edward B Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266 (2d Cir. 1944); *Donna v. Dodd, Mead & Co.*, 374 F. Supp. 429 (S.D.N.Y. 1974); 1 NIMMER ON COPYRIGHT §§ 6.10, 6.11). He alleges Stevenson's grant of an exclusive license to Defendant violates these mandates, and therefore the license on which Defendant relies to exploit *Molly* is invalid. *Id.* at 7. In essence, Plaintiff argues that the purported grant of an exclusive license to Defendant by Stevenson undermines his copyright interest in the song, and therefore gives rise to his claim of copyright infringement.

The rights of co-owners of a copyrighted joint work are well-established. Co-owners of a copyright cannot be liable to another co-owner for copyright infringement because each co-owner has an independent right to use or license use of the copyrighted work. *Quintanilla*, 139 F.3d 494 (5th Cir. 1988); *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984); *Morrill*, 157 F. Supp. 2d at 1126 (citing *Oddo*); 1 NIMMER ON COPYRIGHT § 6.10 (1999) ("[A]n authorization to the defendant from one joint owner will be an effective defense to an infringement action brought by another joint owner."). Rather, each co-owner of a copyrighted work has an independent right to use or license the use of the copyright. *Oddo*, 743 F.2d at 633. A co-owner may grant a non-exclusive license to a third party without the consent of other co-owners. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *Burkitt v. Flawless Records, Inc.*, 03-2483, 2005 WL 6225822 at *11 (E.D.La. June 13, 2005) (quoting 1 NIMMER § 6.12[C] at 6-39 ("[because] a grant executed by less than all of the joint owners of a copyright is necessarily non-exclusive, it follows that any such grant constitutes a non-exclusive license[.]")). Each co-owner is entitled to an equal undivided interest in the whole work, and a co-owner must account to the other co-owners for any profits earned from licensing or use of that copyright. *Thomson*, 147 F.3d at 199;

*Quintanilla*, 139 F.3d at 498; *Jordan v. Sony BMG Music Entm't, Inc.*, 637 F. Supp. 2d 442, 459

(S.D. Tex. 2008) (citing *Quintanilla*).

While it is well-settled that co-owners of a joint work are free to grant nonexclusive

licenses to third parties, there is greater latitude for debate on the issue that arises when co-

owners purport to grant *exclusive* licenses to third parties. The parties have offered widely

divergent interpretations of the consequences of Defendant asserting an exclusive license over

*Molly*. The Second Circuit in *State v. Davis*, 505 F.3d 90 (2d Cir. 2007) provides the relevant

framework for resolving this dispute:

> Early in the twentieth century, we stated in the copyright context the
> venerable principle of the law of property that, while an owner may convey any of
> his rights to others permanently or temporarily, he may not convey more than he
> owns. *Maurel*, 271 F. at 215 ("[W]hen the [co-owners] granted rights to [a music
> publisher], they could but transmit what they had to part with, and they could not
> transfer what interest the [other co-owner] had."); *see also Filmvideo Releasing
> Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir.1981) ("[T]he proprietor of a
> derivative copyright cannot convey away that which he does not own...."").
> Accordingly, an owner may give a license to someone to exploit the work in some
> way, provided he owns that particular copyright interest. 17 U.S.C. § 106. An
> owner may also convey his interest in prosecuting accrued causes of action for
> infringement. *ABKCO Music*, 944 F.2d at 980; *see also Prather v. Neva
> Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir.1969) (noting the effectiveness of an
> assignment of accrued causes of action for copyright infringement).
>  An owner may not, however, convey the interests of his fellow co-owners
> without their express written consent, even if the transferee has no notice of the
> non-consenting owners' interest. *See Crosney v. Edward Small Productions*, 52
> F.Supp. 559, 561 (S.D.N.Y.1942) ("One [co-owner of a copyright] cannot bind
> the interest of another, although he purports to do so, in the absence of assent or
> ratification upon her part." (internal quotation marks omitted)). A co-owner's
> ability to grant licenses to third parties unilaterally will therefore depend on the
> type of licenses granted. There are two general categories of licenses: non-
> exclusive licenses, which permit licensees to use the copyrighted material and
> may be granted to multiple licensees; and exclusive licenses, which grant to the
> licensee the exclusive right—superior even to copyright owners' rights—to use
> the copyrighted material in a manner as specified by the license agreement. A
> valid license of either sort immunizes the licensee from a charge of copyright
> infringement, provided that the licensee uses the copyright as agreed with the
> licensor. *See Graham v. James*, 144 F.3d 229, 236 (2d Cir.1998) ("A copyright
> owner who grants a nonexclusive license to use his copyrighted material waives

his right to sue the licensee for copyright infringement."); *United States Naval Institute v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir.1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."); *see also McKay v. Columbia Broad. Sys. Inc.*, 324 F.2d 762, 763 (2d Cir.1963) ("[A] license from a co-holder of a copyright immunizes the licensee from liability to the other co-holder for copyright infringement.").

A co-owner may grant a non-exclusive license to use the work unilaterally, because his co-owners may also use the work or grant similar licenses to other users and because the non-exclusive license presumptively does not diminish the value of the copyright to the co-owners. *See Meredith v. Smith*, 145 F.2d 620, 621 (9th Cir.1944) (noting that a "co-owner had the right to give permission" for nonexclusive use of a copyrighted work); 1 Nimmer § 6.10[A], 6–34. In any event, a co-owner who grants a non-exclusive license is accountable to his co-owner for income gained by the grant of the license. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 223 F.2d 252, 254 (2d Cir.1955). However, a licensee is not liable to a non-licensing co-owner for use authorized by the license, because the licensee's rights rest on the license conveyed by the licensing co-owner. *See McKay* 324 F.2d at 763. Likewise, a licensee need not pay any royalties or other consideration to the co-owners who are not parties to the license agreement. *See Piantadosi v. Loew's, Inc.*, 137 F.2d 534, 537 (9th Cir.1943) (holding that a third party granted a non-exclusive copyright license by one co-owner had no duty to the other co-owner); 1 NIMMER § 6.12(c)(3). A non-exclusive license conveys no ownership interest, and the holder of a nonexclusive license may not sue others for infringement. *See Eden Toys*, 697 F.2d at 32 ("The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights."). An exclusive license, on the other hand, conveys an ownership interest. *See Campbell v. Trustees of Stanford University*, 817 F.2d 499, 504 (9th Cir.1987). Accordingly an exclusive licensee may sue others for infringement, including the licensor if the licensor infringes on the exclusive right he granted the licensee. *See U.S. Naval Institute*, 936 F.2d at 695 (citing 3 NIMMER § 12.02). Because no one other than the exclusive licensee may exercise the right specified by the exclusive license agreement, the interests of the other co-owners to use or grant non-exclusive licenses to the work are necessarily impaired. An exclusive license thus destroys the value of a copyright to the copyright owners, to the extent that the licensed rights cannot be used or exploited by the copyright owners. Unlike a transfer of one co-owner's copyright interest to another person, which conveys only the co-owner's share of that interest, an exclusive license grants all co-owners' shares of a particular copyright interest to the exclusive licensee. Accordingly, a co-owner cannot unilaterally grant an exclusive license. *See Maurel*, 271 F. at 216 ("Where two or more persons have a common interest in a property, equity will not allow one to appropriate it exclusively to himself, or to impair its worth as to others."); 1

NIMMER § 6.11 (noting prohibition on one co-owner granting an exclusive license without consent of other co-owners).

*Davis*, 505 F.3d at 99-101.

Expounding upon the basic notion that a joint owner cannot license more than his ownership interest in a copyrighted work, another court offered the following explanation for the practical consequences of a joint owner purporting to grant an exclusive license to a third party:

> When a joint owner grants a nonexclusive license, the licensee obtains the right to exploit the work according to the license but has no right to prevent the licensor or other joint owners from further exploiting the work directly or licensing additional third parties to exploit it. 1 NIMMER ON COPYRIGHT § 6.10[A][2][b]. When a joint owner grants an exclusive license, however, the licensor loses the right (while the license is in effect) to exploit the work directly or even to license the work to additional third parties. *Id.* § 6.10[A][2][c]. Yet the exclusivity of a license granted by a joint owner does not apply against the other joint owners, who, having done nothing to alienate their own rights, may continue to exploit or further license the work. *See id.* § 6.10[A][2][d] (citing *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir.2007)). In fact, the Ninth Circuit has ruled that a joint owner's exclusive licensee has the status of a nonexclusive licensee for the purposes of standing to sue for infringement. *See id.* (citing *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir.2008))… In the context of intellectual property, the difference between "exclusive" and "nonexclusive" licenses concerns the continuing ability of the grantor to use or further license to others the licensed property during the period the license is in effect. An "exclusive" license is "[a] license that gives the licensee the sole right to perform the licensed act ... and that prohibits the licensor from performing the licensed act and from granting the right to anyone else...." Black's Law Dictionary 1003 (9th ed. 2009). A "nonexclusive" license does not impose this limitation on the licensor. A joint owner of a work may…grant a license that is exclusive as against him, i.e., he may no longer exploit or further license the work. But such a licensee cannot prevent the other joint owner(s) from using or further licensing the work. In a sense, then, such a license is both exclusive and nonexclusive. *See* 1 NIMMER & NIMMER, supra, § 6.10[A][2][c]-[d] (explaining that an exclusive license from fewer than all joint owners is exclusive as against the licensor, but not as against the other joint owners). By analogy, one tenant-in-common as to a parcel of land may lease the land without the consent of the other tenants-in-common, but he is liable to account to the other tenants for the rents, and even if the first tenant promises his lessee that he will vacate the land during the lease, the first tenant and his lessee cannot via this separate agreement prevent the other tenants from going onto their own land.

*Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1243-44 (D. Nev. 2011).

Analyzing the facts of the instant case under the framework promulgated by either the *Davis* or the *Corbello* courts, Plaintiff is not entitled to relief. According to Defendant, its license to exploit *Molly* originated when Stevenson (and Tyga Music) *transferred his ownership interest* to Cash Money, which, by operation of various agreements, ultimately granted Defendant an exclusive license to exploit the song. (*See* Doc. 16-1 at 10; 16-3 at 22-23.) Under this view, it is clear that the "exclusive license" Defendant purports to hold does not trammel on the copyright interest Plaintiff has in *Molly*, as it can only claim an exclusive license over *Stevenson's interest* in the song. *See Davis*, 505 F.3d at 101 ("a transfer of one co-owner's copyright interest to another person [ ] conveys only the co-owner's share of that interest."). Just as a co-owner of a parcel of land would be free to alienate his ownership interest to a third party without impinging upon his co-owners' rights, Stevenson, as co-owner of *Molly*, was free to transfer his ownership interest in *Molly* to Cash Money without violating Plaintiff's rights under copyright. *See e.g.*, *id.*; *Corbello*, 832 F. Supp. 2d at 1244. From there, the various preexisting agreements between Cash Money, Young Money, Universal, and Defendant entitled Defendant to exercise a valid license to exploit the song. (*See* Docs. 16-1 at 10; 16-4 at 1; 16-5 at 1.)

Plaintiff, by another view, characterizes Defendant's claims as exercising exclusive rights to license *Molly* in its entirety, which, according to Plaintiff, impermissibly infringes upon his own rights in the song. (Doc. 25 at 7.) He vehemently insists that his consent was required before Stevenson could grant an exclusive license to a third party. However, it appears Plaintiff misinterprets the practical consequences of Defendant's purported "exclusive license." As discussed above, Defendant's license derived from Stevenson's transfer of his ownership rights in *Molly*. However, even accepting Plaintiff's allegations as true, and that Stevenson purported to grant an exclusive license, this still would not undermine Plaintiff's ability to license the work.

Under the framework laid out in *Corbello*, Stevenson's "exclusive license" would be exclusive as to *Stevenson*, the licensor, who would no longer be free to grant additional nonexclusive licenses to third parties. In this sense, the license would be "exclusive." However, because "the exclusivity of a license granted by a joint owner does not apply against the other joint owners," *Corbello*, 832 F. Supp. 2d at 1243, Plaintiff, for all intents and purposes, may regard the alleged "exclusive license" as a nonexclusive license that does not infringe upon his copyright. The consequence of Stevenson's transfer of ownership and subsequent licensing to a third party simply means that *Stevenson* is no longer free to grant additional licenses to third parties, as *his* rights are exclusively licensed to Cash Money. *See e.g.*, *Davis*, 505 F.3d at 99-101; *Corbello v. DeVito*, 832 F. Supp. 2d at 1243-44. Simply stated, *Plaintiff's* copyright interest in *Molly* is not subject to the exclusive license claimed by Defendant, and Defendant's purported exclusive license does not infringe upon Plaintiff's rights under copyright.

Plaintiff's other arguments are similarly without merit. Although he insists, under U.S. law, that the consent of all joint owners is required to exploit the work internationally (Doc. 25 at 6), he cites no jurisprudential nor statutory authority in support of this assertion. In fact, the only support he offers for his argument comes from 1 Nimmer § 6.10, which, in relevant part, reads as follows:

[D] The Effect in Foreign Jurisdictions of a Unilateral License by One Joint Author

A licensee who expects to exploit the licensed work only within the United States may well rely upon a nonexclusive license that he may obtain from only one of several joint owners. However, the licensee who intends to exploit the work on an international basis, as is the case for example in motion picture distribution, will find that such a license is inadequate to meet his requirements. This for the reason that *in foreign jurisdictions*, a license will not be valid unless all joint owners are party to it. Therefore, in general, the licensee of a single joint owner will be unable to exploit his work abroad, even though in given instances, this problem may be surmounted by legal machinery for requiring the nonconsenting joint

owners to join in a license whose terms have been judicially or administratively approved.

(emphasis added). Importantly, the jurisprudential and statutory authority relied on by Nimmer in this passage all comes from foreign jurisdictions,[11] and neither Nimmer nor this Court have identified a single case from within the United States standing for the proposition Plaintiff alleges here. It goes without saying this Court is not bound by the caselaw of foreign jurisdictions, and the Court declines to adopt such a rule within this jurisdiction. Moreover, while Plaintiff's assertion that "a co-owner cannot unilaterally license a joint work in such a manner as to cause destruction of the work and render the co-owner's rights valueless" (Doc. 25 at 6 (quoting 1 NIMMER § 6.10)) is firmly rooted in domestic jurisprudence (*see e.g.*, *Brown v. Republic Prods., Inc.*, 26 Cal. 2d 867, 161 P.2d 796 (1945); *Maurel v. Smith*, 271 F. 211 (2d Cir. 1921)), he makes no showing of how Defendant's license of *Molly* has caused destruction of the work or rendered his rights valueless. Accordingly, he has failed to demonstrate that any of the complained of conduct infringed upon his copyright.

### e. Defendants did not vicariously or contributorily infringe upon Plaintiff's copyright interest in *Molly*

Plaintiff also alleges Defendant vicariously or contributorily infringed upon Plaintiff's copyright interest in *Molly*, because without Defendant's assistance, Stevenson, Tyga Music,

---

[11] Specifically, Nimmer cites the following cases and statutes: United Kingdom: *Powell v. Head*, 12 Ch. D. 686 (1879); *Cescinsky v. George Routledge & Sons, Ltd.*, 2 K.B. 325 (1916); France: Law No. 57-296, § 10, Act of March 11, 1957; Italy: Law No. 633, § 10, Act of April 22, 1914 as amended; Mexico: Act of Dec. 31, 1956, §§ 9 & 10; Japan: Law No. 39, §§ 13, 33 Act of March 4, 1869 as amended; Canada: *Massie & Renwick, Ltd. v. Underwriters' Survey Bureau, Ltd.*, 1 D.L.R. 625 (1940). *See generally* Cary, "Joint Ownership of Copyrights," Copyright Office Study No. 12; France: Law No. 57-296, § 10, Act of March 11, 1957; Italy: Law No. 633, § 10, Act of April 22, 1941 as amended; Japan: Law No. 38, § 13, Act of March 4, 1869 as amended; Mexico: Act of Dec. 31, 1956, §§ 9 & 10. *See* 1 NIMMER ON COPYRIGHT § 6.10, n. 80-81.

Young Money and Cash Money would not be able to exploit the song.[12] (Doc. 2 at 6-7.) Defendant maintains it holds a valid license to exploit *Molly*, and it therefore cannot be liable for copyright infringement, regardless of whether Plaintiff alleges a theory of direct, vicarious, or contributory infringement. (*See generally* Doc. 16-1 at 8-14.)

Contributory infringement occurs where one intentionally induces or encourages direct infringement. *Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931, 125 S.Ct. 2764, 2776, 162 L.Ed.2d 781 (citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). One commits vicarious infringement by profiting from direct infringement while declining to exercise a right to stop or limit the infringement. *Id.* (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). "There are two elements to a successful claim of vicarious copyright infringement: (1) 'the right and ability to supervise the infringing conduct' and (2) 'an obvious and direct financial interest in the exploitation of copyrighted materials.'" *Looney Ricks Kiss Architects, Inc. v. Bryan*, 07-572, 2010 WL 5175171, at *5 (W.D. La. Dec. 7, 2010) (citing 3–12 NIMMER ON COPYRIGHT § 12.04[A][2] (quoting *Shapiro*, 316 F.2d at 307)). A claim of vicarious or contributory infringement cannot lie absent a showing of direct infringement by a third party, though it is not necessary that the directly infringing party is named as a defendant in the litigation. *See Metro-Goldwyn-Meyer*, 545 U.S. at 939, n. 12, 125 S.Ct. at 2781.

Plaintiff's claim of vicarious or contributory infringement fails as a matter of law because Plaintiff has failed to allege any valid instances of direct infringement of his copyright interest in *Molly* by Defendant or any third party. Accordingly, it follows Defendant cannot be found liable

---

[12] Plaintiff also alleges in his Second Amended Complaint a theory of vicarious or contributory infringement based on the theory that the completed work of *Molly* was a derivative work based on his musical composition. (*See* Doc. 36-1 at 7-9.) This claim is discussed in further detail below, and it is likewise without merit.

for vicarious or contributory infringement in the absence of a finding of direct infringement, and this claim is without merit.

### f. Plaintiff's pleadings fail to show *Molly* is a derivative work

Plaintiff alleges for the first time in his supplemental memorandum (Doc. 36) in opposition to Defendant's motion for judgment on the pleadings that the completed composition of *Molly* (which he calls Molly 2) is a derivative work of his musical composition, which he calls Molly 1. He claims Defendant's continued exploitation of Molly 2 "constitutes infringement upon the copyright of the original work where permission is lacking. Molly 2, the derivative work, infringes upon [Plaintiff's] copyright of Molly 1." (Doc. 36 at 5.) In support of his characterization, Plaintiff cites *Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984), which he claims stands for the proposition "that derivative works infringe upon the copyright of the original work where permission is lacking." (Doc. 36 at 5.) Notably, he cites no other caselaw to support his position that the completed work of *Molly* is a derivative work.

Defendant argues *Oddo* is inapposite to the instant case and lends no support to Plaintiff's position. (Doc. 39 at 5.) Specifically, Defendant notes *Oddo* is factually distinguishable because it concerned a manuscript and a book, not a song in varying stages of completion. *Id.* Additionally, it offers a different interpretation of *Oddo*, namely that the plaintiff gave an implied license to the defendant to use the plaintiff's articles in a manuscript, but that implied license did not extend to the use of the articles in a separate, distinct book. *Id.* It notes that here, by contrast, Plaintiff does not allege that Defendant or any third party attempted any unauthorized use of Molly 1 outside of Molly 2, and insists its usage of Molly 2 is consistent with the usage Plaintiff and Stevenson envisioned at the time they agreed to create their individual contributions to their joint work.

Under 17 U.S.C. § 106, the owner of a copyright retains the exclusive right to prepare derivative works based upon the copyrighted work.

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaboration, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. To support a finding that a work is derivative, it is imperative that the work is one that is based upon a preexisting work. *See Weissmann v. Freeman*, 868 F.2d 1313, 1321 (2d Cir. 1989). The author of a derivative work must obtain permission to create the work from the owner of the copyright in the underlying work. *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 522-23 (7th Cir. 2009). Failure to obtain such permission from the owner of the underlying copyright renders the derivative work an infringement on the owner's copyright. *Id.* One who obtains permission to use a copyrighted work in the production of a derivative work may not exceed the specific purpose for which permission was granted. *Gilliam v. American Broad. Cos., Inc.*, 538 F.2d 14, 20 (2d Cir. 1976). Thus, it necessarily follows that to bring an action for copyright infringement based upon a derivative work, the claimant must hold a valid copyright in the underlying work. *See id.*; *Schrock*, 586 F.3d at 522-23.

In this case, Plaintiff alleges he is the sole copyright owner of Molly 1. (Doc. 36 at 3-4.) Notably, Plaintiff provides receipts from the Copyright Office indicating he filed to register "Molly" for copyright and paid the requisite fees, but he does not provide any proof of the actual substance of his filing. (*See* Doc. 2-3.) Thus, the Court is lacking necessary information regarding the specifics of his copyright application; specifically, the Court is left wondering whether Plaintiff filed a copyright over solely the music to *Molly* (i.e. Molly 1) or if he filed for copyright over the completed work (Molly 2). Remarkably, neither party submitted as exhibits to

the pleadings the record of copyright registration number PA001891413, which the Court located *sua sponte*,[13] and which reflects a copyright for the song "'Molly' as contained on Hotel California". This copyright registration shows that Plaintiff, Stevenson, and several others jointly hold the copyright to *Molly*, and, critically, that Plaintiff claims authorship of both the music *and lyrics* of the song. Accordingly, the only actual proof before the Court as to the nature of the copyright Plaintiff holds is to the music and lyrics of *Molly*; in other words, he holds a copyright interest in what he terms "Molly 2." Therefore, the Court is unable to conclude as a matter of fact or law that Molly 2 is a derivative work of Molly 1 because Plaintiff has not provided any documentation to support his claim that he holds the exclusive copyright to the music of *Molly*.

In any event, even assuming Plaintiff attached to his pleadings documentation substantiating his claim that he is the sole copyright holder of Molly 1, his characterization of a derivative work misses the mark. Molly 1 was not a preexisting, stand-alone work which a third party appropriated for use in a wholly separate and distinct work. Plaintiff's intent, as evidenced by the Agreement, was to create Molly 1 to furnish Stevenson with music to accompany his lyrics and create Molly 2. (*See* Doc. 16-2 at 1) ("This letter will constitute our agreement regarding your furnishing the services of [Plaintiff]… to produce one (1) master recordings (the 'Master') of the musical composition tentatively titled "Molly" (the 'Composition'), embodying the recorded performances of Michael Stevenson… for possible inclusion on an album (the 'Album') to be delivered by Artist to Young Money Entertainment, LLC ('Company') for the manufacture and distribution of records and other uses…"). This is wholly distinguishable from

---

[13] In evaluating a motion for judgment on the pleadings, "it is clearly proper… to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461, n. 9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343, n. 6); Wright & Miller 5B FED. PRAC. & PROC. CIV. § 1357 (2d Ed.) ("In determining whether to grant a Federal Rule 12(b)(6) motion, district courts primarily consider the allegations in the complaint. The court is not limited to the four corners of the complaint, however. Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, *matters of public record*, orders…") (emphasis added).

*Oddo*, in which the plaintiff authorized certain articles he had written for inclusion in a manuscript, and a third party subsequently used those articles in a stand-alone book without the plaintiff's prior authorization. *See* 743 F.2d at 632. This Court has been unable to identify a single case in which a court has found a completed song consisting of music and lyrics to be a derivative work of the music underlying the song. Accordingly, even if Plaintiff were to come forward with documentation supporting his claim that he is the sole copyright holder of Molly 1, he would still not be able to establish Molly 2 is a derivative work that violates his copyright interests. This claim fails.

### g. Plaintiff's state law claims

Based on the foregoing, it is clear that with regard to Plaintiff's federal claims of copyright infringement (Count I) and vicarious or contributory infringement (Count II), that Defendant is entitled to judgment on the pleadings. Therefore, Plaintiff's request for an injunction (Count IV), which is based upon Counts I and II, must also be denied. The only remaining claims in this action are Plaintiff's state-law claims of unfair trade practices and unfair competition (Count III), his newly-proposed claims of unjust enrichment/quantum meruit/constructive trust (Count V), Conversion (Count VII), Accounting (VIII), his request for damages under La. Civ. Code art. 2315 *et seq.* (Count IX), and his request for damages under La. Civ. Code art. 2324. (*See* Doc. 36-1.)

Because the Court has dismissed all claims over which it could have original subject matter jurisdiction, it must now determine whether to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. To determine whether to relinquish jurisdiction, a district court must analyze the statutory factors set forth by 28 U.S.C. § 1367(c) and the common law factors of judicial economy, convenience, fairness, and comity. *See Enochs v. Lampasas Cty.*, 641 F.3d

155, 158-59 (5th Cir. 2011) (citations omitted). "The statutory factors are: (1) whether the state

claims raise novel or complex issues of state law; (2) whether the state claims substantially

predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4)

whether there are exceptional circumstances or other compelling reasons for declining

jurisdiction." *Enoch*, 641 F.3d at 159 (citing 28 U.S.C. § 1367(c); *see also United Mine Workers*

*of Am. v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (setting forth the

common law precursor to § 1367(c))). "[T]he overall balance of the statutory factors is

important." *Id.* (citation omitted). In *Enochs*, the Fifth Circuit explained:

> "Our general rule is to dismiss state claims when the federal claims to
> which they are pendent are dismissed." *Parker & Parsley,* 972 F.2d at 585 (citing
> *Wong v. Stripling,* 881 F.2d 200, 204 (5th Cir.1989)); *see Carnegie–Mellon,* 484
> U.S. at 351, 108 S.Ct. 614 (noting that when the federal claims are eliminated at
> an "early stage" of the litigation the district court has "a powerful reason to
> choose not to continue to exercise jurisdiction"); *Gibbs,* 383 U.S. at 726, 86 S.Ct.
> 1130 ("Certainly, if the federal claims are dismissed before trial, even though not
> insubstantial in a jurisdictional sense, the state claims should be dismissed as
> well."); *Brookshire Bros.,* 554 F.3d at 602 (noting that "the general rule is that a
> court should decline to exercise jurisdiction over remaining state-law claims when
> all federal-law claims are eliminated before trial"); *Beiser v. Weyler,* 284 F.3d
> 665, 675 (5th Cir.2002) (noting that where "no other grounds for federal
> jurisdiction exist, the court must ordinarily remand the case back to state court").
> Indeed, the Supreme Court has for nearly half a century cautioned federal courts
> to avoid "[n]eedless decisions of state law" . . ." *Gibbs,* 383 U.S. at 726, 86 S.Ct.
> 1130.

*Enochs*, 641 F.3d at 161.

In this case, the Court finds the statutory and common law factors favor declining to

exercise supplemental jurisdiction over Plaintiff's state law claims. First, the state law claims

substantially predominate over the dismissed federal claims, as all federal claims have been

dismissed. Thus, the second and third statutory factors are satisfied, and it is immaterial whether

the first factor has been satisfied. *See Welch v. Jannereth*, 496 F. App'x 411, 413 (5th Cir. 2012)

(novelty of Plaintiff's state law claims "is unimportant" where second factor has been satisfied).

Additionally, the Court notes this litigation is in its early stages, and discovery has not yet begun. Therefore, the interests of judicial economy favor dismissal of the state law claims. Based on the foregoing, the Court will decline to exercise supplemental jurisdiction over the Plaintiff's state law claims in accordance with 28 U.S.C. § 1367(c); *See Certain Underwriters at Lloyd's, London ... v. Warrantech Corp.*, 461 F .3d 568, 578 (5th Cir.2006) ("we have stated that it is our 'general rule' that courts should decline supplemental jurisdiction when all federal claims are dismissed or otherwise eliminated from a case.").

### h. Conclusion

Viewing the pleadings in the light most favorable to Plaintiff, it is clear that the facts, as pleaded, do not entitle Plaintiff to relief on his federal claims. Moreover, neither of his proposed amended complaints salvage his claims. (*See* Docs. 36-1; 40-1.) Therefore, Defendant is entitled to judgment on the pleadings pursuant to Fed. R. Civ. Pro. 12(c).

Accordingly,

**IT IS ORDERED** that Defendant UMG Recordings, Inc.'s Rule 12(c) Motion for Judgment on the Pleadings (Doc. 16) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Desmond Mapp's Motion for Leave of Court to File a Rebuttal Memorandum (Doc. 42) is **DENIED;**

**IT IS FURTHER ORDERED** Plaintiff's Motion to Strike (Doc. 42) is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike (Doc. 41) is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that all federal claims against Defendant, including all claims arising under 17 U.S.C. § 101 *et seq.* are **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that all state law claims against Defendant are

**DISMISSED WITHOUT PREJUDICE**.

Signed in Baton Rouge, Louisiana, on September 21, 2016.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**